IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-44-FL

| | | |
|---|---|---|
| LIRIS S.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MORRIS & ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 19). Plaintiff responded in opposition and defendant replied. In this posture, the issues raised are ripe for ruling. For the following reasons, the motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff commenced this action on February 5, 2020, and filed the operative amended complaint (the "complaint")[1] on June 22, 2020, asserting North Carolina common law and statutory claims arising out of defendant's sale of poultry processing equipment to plaintiff. Plaintiff asserts the following claims: 1) breach of express warranty, under N.C. Gen. Stat. § 25-2-313; 2) fraud in the inducement; 3) fraudulent misrepresentation; 4) right to reject and return, pursuant to the Uniform Commercial Code ("UCC") §§ 2-601 to 2-604; 5) breach of implied covenant of good faith and fair dealing; and 5) unfair and deceptive trade practices under N.C.

---

[1] Hereinafter, all references to the "complaint" in the text of this order and "Compl." in citations are to the operative amended complaint filed June 22, 2020, unless otherwise specified.

Gen. Stat. § 75-1 ("UDTPA"). Plaintiff seeks enforcement of terms and conditions of a contract for sale of goods, and plaintiff seeks damages, including compensatory, punitive, and statutory damages, with interest, costs, and attorney fees.

Defendant filed the instant partial motion to dismiss on July 6, 2020, seeking dismissal of plaintiff's fraud claims (second and third claims), claim for breach of implied duty (fifth claim), and unfair and deceptive trade practices claim (sixth claim).[2] Defendant does not seek dismissal of plaintiff's first and fourth claims. Defendant filed an answer on the same date. Plaintiff responded in opposition to the instant motion on July 27, 2020, and plaintiff replied on August 10, 2020.

In the meantime, the court entered case management order on July 15, 2020, setting an April 30, 2021, deadline for discovery and a June 1, 2021, deadline for dispositive motions.

## STATEMENT OF THE FACTS

Plaintiff alleges in the complaint detailed facts regarding the negotiation, formation, and performance of an agreement for the sale of poultry processing equipment by defendant to plaintiff. For ease of reference, the court sets forth those factual allegations largely without alteration, here.

Plaintiff is a company with headquarters in the province of Guayas, Ecuador, primarly engaged in the development of agricultural activities as well as the production and commercialization of balanced food, including poultry product lines. Defendant is a company with headquarters in Garner, North Carolina, which designs, produces, and sells systems for chilling poultry and producing ice for industrial application.

Defendant attended the 2016 International Poultry Producers Exhibition in Atlanta, Georgia, which was held on or around January 26–28, 2016 (the "Exhibition"). Plaintiff attended

---

[2]  Defendant earlier on May 20, 2020, filed a partial motion to dismiss and answer, which were rendered moot by plaintiff's filing of the operative amended complaint on Jun 22, 2020.

the Exhibition to search for a cooling system which would increase plaintiff's plant's yield of chicken processing over time. Plaintiff visited defendant's stand at the Exhibition.

At the time of the Exhibition, plaintiff's plant had been operating at a processing rate of 3,000 chickens per hour. Plaintiff intended that plaintiff's plant would eventually reach the ability to process up to 6,000 chickens per hour.

On or around May 24, 2016, defendant (specifically Jose Ferney Garcia ("Garcia")) emailed plaintiff (specifically Santiago Saab ("Saab")) to discuss the possibility of defendant's representatives traveling to plaintiff's plant in Ecuador to check the current conditions of the plant and to analyze the future installation of a cooling system, and plaintiff agreed to host defendant's representatives.

On or around June 17, 2016, defendant sent plaintiff a quote, Quote Number 4026 S, for the Quik Chill 3000, designed for the cooling of 3,000 chickens per hour. In an email from Saab to Garcia that same day, plaintiff responded to defendant's Quote Number 4026 S. Plaintiff informed defendant that plaintiff was currently running at a line speed of 3,000 chickens per hour, and plaintiff informed defendant of its intention to increase progressively to run at a line speed of 6,000 chickens per hour in the future.

On or around June 20, 2016, defendant sent plaintiff another quote, Quote Number 4027 S, for a Quick Chill 3000 traditional Prechiller, designed for the cooling of 6,000 chickens per hour. On or around June 26, 2016 through June 28, 2016, defendant (namely Garcia) visited plaintiff's plant.

Defendant ran an actual conditions test while visiting plaintiff's plant, which confirmed that plaintiff was operating at a line speed was 3,000 chickens per hour. Defendant observed all operations of the plaintiff's plant, current equipment, and other standards and procedures specific

3

to the plaintiff's production. After further discussions between the parties in February 2017, defendant's representatives (specifically Jorge Reinoso ("Reinoso") and Garcia) attempted to sell plaintiff a different machine, which was part of a new system using defendant's "DTM" technology. Defendant called the DTM technology an "innovative" machine which would increase plaintiff's water retention yield of fresh chicken measured at forty-eight hours by 1.5%. (Compl. ¶ 18).

A 1.5% increase in yield would equate to approximately an extra $60,000 per month to plaintiff. Plaintiff was intrigued by defendant's claims to plaintiff and desired to purchase the DTM system based on defendant's yield claims about the new technology. In an email dated February 17, 2017 from Reinoso to Saab, defendant sent updated contract terms, including: (1) a screw chiller "needed to carry the system at 6,000 chickens per hour, with a result of 4 degrees Celsius measured in the center of the breast and an increase in the retained absorption at 48 hours by 1.5%," and (2) a "fine for compliance penalty," which was approved because "we are sure that what we offer is achievable." (Id. ¶ 20). Reinoso went on in that email to say that he "hope[s] this commitment value ratifies you that we are absolutely sure of what we are offering and of the result that you will obtain." (Id.).

In a response email dated February 17, 2017, Saab indicated to Reinoso that those line speed terms were not viable, and asked Reinoso to comment on potentially lengthening the chiller and/or prechiller "to work up to 3200 chicken/hour and when we make the change to 6000 [chickens per hour] buy this new prechiller," once again confirming that plaintiff was not operating at 6,000 chickens per hour. (Id. ¶ 21).

In a response email dated February 17, 2017, Reinoso stated to Saab that Saab's proposal "seemed to [him] possible." (Id. ¶ 22). Reinoso suggested an alternative solution wherein

4

defendant would remove the non-performance fine and plaintiff would operate defendant's equipment under current conditions, and that "under these conditions you will have an increase in carcass yield compared to the current conditions, but any value that we tell you that this increase could be, will not be more than an estimate." (Id.).

In a response email dated February 17, 2017, Saab informed Reinoso that plaintiff wanted to opt for the option wherein defendant would keep the nonperformance fine in the contract. Saab additionally asked for the time and density specifications "that you need to guarantee the result of 1.5% [increase in yield]." (Id. ¶ 23). In a response email dated February 17, 2017, Reinoso replied with the required specifications, including that when the line speed was increased to 6,000 chicken per hour, the equipment need not be modified any longer in this "second stage." (Id. ¶ 24). Reinoso also suggested another possibility, wherein plaintiff would buy equipment suited to run at 3,200 chicken per hour, which could later be expanded when plaintiff was running at a higher line speed of 6,000 chickens.

On or around March 6, 2017 Defendant sent Plaintiff a new quote, Quote Number 4183 S r1 (hereinafter "the Agreement"), designed for the cooling of 6,000 chickens per hour. This quote stated that "the optimal results would be achieved at 6,000 chickens per hour." (Id. ¶ 125). This quote was silent as to the functionality of the equipment when it was not run at the exact optimal parameters described therein. Within 30 days of receipt, plaintiff accepted and executed the Agreement.

In purchasing and installing defendant's equipment, plaintiff reasonably expected to experience equal or better water retention rates as plaintiff was experiencing before installing defendant's equipment, especially in light of the February 17, 2017 email from Reinoso, in which

5

he stated that under the plant's current conditions, plaintiff would still see an increase in yield compared to the current conditions.

According to the complaint, if plaintiff had known it would experience a decrease in water retention rates from its then current conditions and suffer business losses after purchasing and installing defendant's equipment, plaintiff would not have purchased and installed defendant's equipment. The total price paid by plaintiff to defendant under the Agreement was $492,200.00.

Defendant's representatives and plaintiff's representative allegedly had bargained in February 2017 to include a guarantee of the yield increase defendant claimed plaintiff would experience as a result of using defendant's comparatively expensive machine. The Agreement provided the following guarantee provisions:

> a. "… guarantee an increase in the yield of fresh chicken measured at 48 hours of 1.5%."
>
> b. "If the parameter described in this section cannot be met, [Defendant] will pay [Plaintiff] a fine of USD $167,600. This fine would be payable proportionally to the compliance percentage. For example, if an increase of 1% is achieved (66% of the commitment) 33% of the fine would be paid."

(Id. ¶ 31).

The Agreement further provided that, in order to solve any disagreement in water retention rates, before the fine could be exercised, defendant must have 120 days from plaintiff's notification of the disagreement to make adjustments and conduct tests, including 15 days of presence in plaintiff's plant. After the Agreement was signed, defendant carried out numerous retention tests to comply with the provisions of the Agreement.

Upon completion of a retention test in June of 2017, in July of 2017, defendant informed plaintiff that to meet the guaranteed retention rate, plaintiff would need to purchase another chiller to complement the equipment already purchased by plaintiff in March 2017 from defendant. On or around July 7, 2017, defendant sent plaintiff a new quote, Quote Number 5097 S r1. Per Quote

6

Number 5097 S r1, defendant was to deliver to and assemble for plaintiff a chiller designed for cooling 6,000 chickens per hour. Within 30 days of receipt, plaintiff accepted and executed Quote Number 5097 S r1 in order to comply with defendant's recommendation, paying an additional $175,000.00.

On or around May of 2018, defendant's representatives arrived in Ecuador to install the new equipment at plaintiff's plant. On or around May 11, 2018, plaintiff informed defendant, within 30 days after the new installation, (1) that the equipment still did not meet the expected retention rate increase of 1.5%, and (2) that the retention rate had actually decreased by around 1% from the rate plaintiff had experienced before the installation of any of defendant's DTM equipment. The Agreement was silent on any ability for the plaintiff to return any of the equipment purchased from the defendant. According to the complaint, defendant accepted plaintiff's offer to come down to the plant and/or suggest alterations to plaintiff's production for 120 days in an attempt to correct the issue of the retention rate.

Between May 14, 2018, and September 14, 2018, plaintiff performed numerous varying tests per defendant's recommendations to troubleshoot the retention discrepancy. Such tests included making adjustments to, among other conditions, the water level, time, ratio of chickens entering the machine to chickens exiting the machine, and scalding temperature. In response to plaintiff's notification that defendant's equipment had not been effective in meeting the guaranteed retention rate, defendant's representatives again came to the plaintiff's plant on or around June 5, 2018. Each time defendant's representatives were in plaintiff's plant, defendant's representatives were given control as to under what conditions the plant was run. Defendant made recommendations to plaintiff for changes in June to August 2018, all of which plaintiff followed.

7

Defendant never itself conducted, nor asked plaintiff to conduct, a line speed of 6,000 chickens per hour. On or about September 18, 2018, after 120 days of tests were completed and the machine still had not increased to the guaranteed retention rate, plaintiff contacted defendant and requested the payment of the fine for not achieving the alleged guarantee parameters of the Agreement signed on March 6, 2017.  On or about October 2, 2018, defendant responded via a letter to plaintiff signed by Reinoso, denying Plaintiff's request for the fine to be paid.  In that letter, allegedly for the very first time, defendant asserted to plaintiff that running the equipment at a slower-than-optimal line speed could have a negative impact on yield, by stating: "Reducing the line speed to 20% of what is specified in our proposal will compound any negative outcomes you may already be experiencing." (Id. ¶ 60).  Twenty-percent (20%) of the contract-specified optimal line speed of 6,000 chickens per hour would be 4,800 chickens per hour, a speed which defendant allegedly knew at all times that plaintiff was operating below.  According to plaintiff, it did not need to offer defendant more time to resolve the deficiency in the performance of defendant's equipment.

Since installing defendant's equipment, videos circulated online, including on popular sites like youtube.com, showing chickens processed in plaintiff's plant draining excessive amounts of water because of the excess hydration and lack of retention. Since installing defendant's equipment and during the period of time the prechiller was installed, plaintiff has received complaints from plaintiff's clients regarding water retention in chickens processed at Plaintiff's plant.  As a result, plaintiff's reputation allegedly was harmed, and plaintiff allegedly lost clients.  After removing defendant's equipment, plaintiff's retention rates returned to historical yield.

**COURT'S DISCUSSION**

A. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (quotations omitted).

B. Analysis

   1. Fraudulent Inducement

Plaintiff claims that defendant induced plaintiff to purchase defendant's equipment through a fraudulent "promise of an increase in the retention rate," "even if [plaintiff] could not get it to operate at optimal conditions." (Compl. ¶¶ 93-94). For the following reasons, plaintiff has not alleged sufficient facts to state a claim of fraudulent inducement on this basis.

"The elements of fraud are: (1) the defendant's false representation of a past or existing fact, (2) defendant's knowledge that the representation was false when made or it was made recklessly without any knowledge of its truth and as a positive assertion, (3) defendant made the false representation with the intent it be relied on by the plaintiff, and (4) the plaintiff was injured by reasonably relying on the false representation." Britt v. Britt, 320 N.C. 573, 579 (1987).

9

"Evidence of a promise which is not fulfilled is not sufficient to support a finding of a false representation unless the evidence shows the promisor made the promise with no intention of fulfilling it." Id. "Mere proof of nonperformance is not sufficient to establish the necessary fraudulent intent." Id. at 580.

To state a claim for fraud on the basis of an unfulfilled promise, a complaint must allege "with sufficient particularity facts from which legal fraud arises or, where proof of actual fraud is necessary to relief, specifically alleges the fraud—that is, the fraudulent intent—and particularizes the acts complained of as fraudulent so that the court may judge whether they are at least prima facie of that character." Hoyle v. Bagby, 253 N.C. 778, 781 (1961). "[T]o be fraudulent the intent not to [perform] must have existed in the defendant's mind at the time he made the promise which induced the plaintiff" to act. Id.

In this case, it is necessary to identify at the outset the specific allegedly fraudulent statement or statements at issue, as well as the specific circumstances of their making. See Fed. R. Civ. P. 9(b). While plaintiff asserts in the fraudulent inducement claim a "promise" of increased retention, (Compl. ¶ 93), the specific alleged statements in the complaint do not contain an express promise and arise in the context of a string of back and forth emails. In pertinent part, plaintiff alleges:

> In [an] email dated February 17, 2017, [Saab] [for plaintiff] indicated to [Reinoso] [for defendant] that [6000 chickens per hour] line speed terms were not viable, and asked [Reinoso] to comment on potentially lengthening the chiller and/or prechiller 'to work up to 3200 chicken/hour and when we make the change to 6000 [chickens per hour] buy this new prechiller,' once again confirming that [p]laintiff was not operating at 6,000 chickens per hour.
>
> In a response email dated February 17, 2017, [Reinoso] stated to [Saab] that Saab's proposal 'seemed to him possible.' <u>Reinoso suggested an alternative solution wherein [d]efendant would remove the non-performance fine and [p]laintiff would operate [d]efendant's equipment under current conditions, and that 'under these conditions you will have an increase in carcass yield compared to the current</u>

10

<u>conditions, but any value that we tell you that this increase could be, will not be more than an estimate.</u>'

In a response email dated February 17, 2017, [Saab] informed [Reinoso] that [p]laintiff wanted to opt for the option wherein [d]efendant would keep the nonperformance fine in the contract. Saab additionally asked for the time and density specifications 'that you need to guarantee the result of 1.5% increase in yield.'

In a response email dated February 17, 2017, [Reinoso] replied with the required specifications, including that when the line speed was increased to 6,000 chicken per hour, the equipment need not be modified any longer in this 'second stage.' Reinoso also suggested another possibility, wherein [p]laintiff would buy equipment suited to run at 3,200 chicken per hour, which could later be expanded when plaintiff was running at a higher line speed of 6,000 chickens.

On or around March 6, 2017 [d]efendant sent [p]laintiff a new quote, Quote Number 4183 S r1 (hereinafter "the Agreement"), designed for the cooling of 6,000 chickens per hour.[3] This quote was silent as to the functionality of the equipment when it was not run at the exact optimal parameters described therein. . . . Within [30] days of receipt, plaintiff accepted and executed the Agreement.

(Compl. ¶¶ 21-26) (emphasis added).

The emphasized statement in the above block-quoted allegations constitutes the closest match of plaintiff's assertion in this claim of a "promise" of increased retention. (Id. ¶ 93). The court accepts for purposes of the instant motion that this emphasized statement constitutes a promise of increased retention, "even if plaintiff could not get [defendant's equipment] to operate at optimal conditions." (Compl. ¶¶ 94). However, in light of the circumstances under which the statement is alleged to have been made, it is not plausible to infer that defendant made the statement with no intention to fulfill the asserted promise.

The alleged circumstances precluding an inference of fraudulent intent include the following. First, the emphasized statement is made under the condition of "an alternative solution wherein [d]efendant would remove the non-performance fine <u>and</u> [p]laintiff would operate

---

[3] This quote further allegedly stated that "the optimal results would be achieved at 6,000 chickens per hour." (Compl. ¶ 125).

11

[d]efendant's equipment under current conditions, and that 'under these conditions you will have an increase in carcass yield compared to the current conditions, but any value we tell you that this increase could be, will not be more than an estimate." (Id. ¶ 22) (emphasis added). In other words, the promise is made with the condition that defendant "would remove the non-performance fine." (Id.). That is not a condition that is ever alleged to have taken place. Thus, it is unreasonable to infer defendant intended not to fulfill its promise in the February 17, 2017, email if one of the conditions under which it was made never took place.

In addition, and in the alternative, plaintiff does not allege any facts otherwise giving rise to an inference that defendant knew in February 2017 that its equipment would not be able to provide some increased retention under the existing conditions. The extended informational exchanges, proposals, and counterproposals, taking place from May 2016 through February 2017, do not permit an inference of fraudulent intent. Plaintiff does not allege any facts suggesting that defendant had a hidden agenda, or motive, or intended to induce plaintiff to buy equipment that would not work as forecasted. Instead, defendant is alleged to have been open about the need for a system at 6,000 chickens for hour to obtain a 1.5% retention rate. (Id. ¶¶ 20; 25). At the same time, defendant expressed reservations about performance under existing conditions by stating that operation under existing conditions "seemed . . . possible," and that "any value that we tell you that this increase could be, will not be more than an estimate." (Id. ¶ 22). In light of the alleged context of the statements made, plaintiff has not alleged "with sufficient particularity facts from which legal fraud arises" or facts upon which to infer that "the intent not to [perform] must have existed in the defendant's mind at the time he made the promise." Hoyle, 253 N.C. at 781.

Plaintiff argues that it has stated a claim of fraudulent inducement because defendant promised "a result that it knew could never and would never be achieved with the Plaintiff's current

12

Case 5:20-cv-00044-FL   Document 29   Filed 10/22/20   Page 12 of 19

plant conditions." (Pl's Mem. (DE 24) at 13). But, plaintiff does not allege facts permitting an inference of such knowledge on the part of defendant. The extent of defendant's alleged knowledge about the capabilities of its equipment is portrayed through defendant's statements set forth in the complaint, and all of those statements were made to plaintiff directly. (See, e.g., Compl. ¶¶ 11-25, 31-38).

Plaintiff also claims that defendant engaged in fraudulent inducement by omitting any suggestion of a line speed change. Plaintiff asserts, for example, that defendant "omitted suggesting or implementing a line speed change," "conceal[ed] the harm that would be caused to the [p]laintiff by installing the [d]efendant's equipment and running at a line speed of less than 6,000 chickens," and "omi[tted] as to mentioning anything about the 6,000 chickens after the sale of the equipment, until the October 2, 2018 letter." (Pl's Mem. (DE 24) at 13-14; see also Compl. ¶¶ 97, 99). These assertions are insufficient to state a claim for fraudulent inducement, however, because defendant allegedly stated repeatedly that its equipment was designed for a speed of 6,000 chickens per hour. (See, e.g., Compl. ¶¶ 20, 24, 25, 36, 125). Moreover, it is not plausible to infer that defendant knew at the time of contract formation that further suggestion of line speed change was necessary to avert harm to plaintiff. Plaintiff seeks an inference of fraudulent intent that is too speculative and unwarranted on the facts alleged, given the multiple alleged factors bearing upon equipment functioning. (See, e.g., id. at ¶¶ 11, 20, 22, 33-34, 40, 43-56).

In sum, plaintiff has not alleged sufficient facts permitting an inference of fraudulent intent. Therefore plaintiff's claim for fraudulent inducement must be dismissed.

    2.    Fraudulent Misrepresentation

In support of its fraudulent misrepresentation claim, plaintiff asserts: "Defendant (specifically Jorge Reinoso) misrepresented to Plaintiff (Santiago Saab) via emails, including one

sent on February 17, 2017, that Plaintiff could still experience an increased retention rate, and that Plaintiff could still be refunded a fine if an increased retention rate was not achieved, even if Plaintiff was not operating at a rate of exactly 6,000 chickens per hour." (Compl. ¶ 105).

Plaintiff's fraudulent misrepresentation claim is similar to, and suffers from the same defects as, its fraudulent inducement claim. Plaintiff suggests that the alleged fraudulent statement is an email response from defendant, overlapping with the allegations quoted in the preceding section, particularly:

> In a response email dated February 17, 2017, [Saab] informed [Reinoso] that [p]laintiff wanted to opt for the option wherein [d]efendant would keep the nonperformance fine in the contract. Saab additionally asked for the time and density specifications 'that you need to guarantee the result of 1.5% increase in yield.'
>
> In a response email dated February 17, 2017, [Reinoso] replied with the required specifications, including that when the line speed was increased to 6,000 chicken per hour, the equipment need not be modified any longer in this 'second stage.' Reinoso also suggested another possibility, wherein [p]laintiff would buy equipment suited to run at 3,200 chicken per hour, which could later be expanded when plaintiff was running at a higher line speed of 6,000 chickens.

(Compl. ¶¶ 23-24) (emphasis added).

As an initial matter, for purposes of the instant fraud claim, it is a stretch to characterize plaintiff's and defendant's email exchange emphasized above as a specific statement by defendant "that Plaintiff could still be refunded a fine if an increased retention rate was not achieved, even if plaintiff was not operating at a rate of exactly 6,000 chickens per hour." (Compl. ¶ 105). This is not what the February 17, 2017, email states, according to the complaint. (See Compl. ¶ 24).

In any event, plaintiff has not alleged facts permitting an inference of fraudulent intent. Plaintiff points to defendant's later position, in October 2018, that plaintiff had to be processing 6,000 chickens per hour to receive a refund under the express warranty. (See Compl. ¶ 106; see also Compl. ¶ 59). However, defendant's asserted position in a dispute with plaintiff in October

14

2018 does not permit a plausible inference of defendant's fraudulent intent in February 2017. Rather, these allegations are similar to those deemed inadequate in Britt and Hoyle. See Britt 320 N.C. at 580 ("Mere proof of nonperformance is not sufficient to establish the necessary fraudulent intent."); Hoyle, 253 N.C. at 781("[T]o be fraudulent the intent not to [perform] must have existed in the defendant's mind at the time he made the promise which induced the plaintiff[.]").

Similarly, plaintiff points to defendant's failure, "during the 120-day troubleshooting period," to suggest that plaintiff "conduct a test of processing 6,000 chickens per hour." (Compl. ¶ 108). Plaintiff asserts that such failure evidences that defendant "never intended to honor the guarantee." (Id.). Defendant's failure to perform, however, in accordance with plaintiff's preferred terms does not permit a plausible inference that defendant made a guarantee with no intention to honor it. See Britt, 320 N.C. at 580; Hoyle, 253 N.C. at 781. Furthermore, plaintiff has not alleged reasonable reliance upon defendant's allegedly fraudulent failure to suggest a test during the 120-day troubleshooting period, where such period took place after formation of the alleged contract. See Britt, 320 N.C. at 579.

In sum, plaintiff fails to state a claim for fraudulent misrepresentation. Therefore, the instant claim must be dismissed.

3. UDTPA

Where plaintiff's fraud claims fail as a matter of law, and where plaintiff's UDTPA is based upon the same alleged fraudulent misrepresentation and concealment, plaintiff's UDTPA also fails as a matter of law. See Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 97 (1985). Therefore plaintiff's UDTPA claim must be dismissed.

### 4. Breach of Covenant of Good Faith and Fair Dealing

Plaintiff pleads a claim for breach of covenant of good faith and fair dealing "in the alternative to its first claim for relief," breach of express warranty, including on the basis that defendant induced plaintiff to purchase additional products from defendant after the initial equipment was purchased. (Compl. ¶¶ 121, 126-127). Defendant argues that a breach of covenant of good faith and fair dealing cannot be pleaded separately in addition to a UCC claim.

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985) (quotations omitted). The duty encompasses an "implied[] promise not to do anything to the prejudice of the other inconsistent with their contractual relations." Tillis v. Calvine Cotton Mills, Inc., 251 N.C. 359, 363 (1959). At the same time, however, "an express contract precludes an implied contract with reference to the same matter." Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713 (1962).

Thus, "an asserted implied term cannot be used to contradict the express terms of a contract." Hancock v. Americo Fin. Life & Annuity Ins. Co., 378 F. Supp. 3d 413, 431 (E.D.N.C. 2019). An implied duty of good faith in a contract "is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 184 (4th Cir. 2000). "An implied duty is simply a recognition of conditions inherent in expressed promises." Id. Accordingly, a claim for "breach of the covenant of good faith and fair dealing is part and parcel of [a] claim for breach of contract." Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000).

Chapter 25 of the North Carolina General Statutes incorporates the UCC. See N.C. Gen. Stat. § 25-1-101(a). Consistent with the aforementioned case law, the UCC recognizes that "[e]very contract or duty within this Chapter imposes an obligation of good faith in its performance and enforcement." N.C. Gen. Stat. § 25-1-304. According to the official comments to this section:

> This section sets forth a basic principle running throughout the Uniform Commercial Code. The principle is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. While this duty is explicitly stated in some provisions of the Uniform Commercial Code, the applicability of the duty is broader than merely these situations and applies generally, as stated in this section, to the performance or enforcement of every contract or duty within this Act. It is further implemented by Section 1-303 on course of dealing, course of performance, and usage of trade. <u>This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.</u> This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.

N.C. Gen. Stat. § 25-1-304 (Official Comments n. 1) (emphasis added). "[A]lthough the Official Comments of the Uniform Commercial Code are not binding upon the court, they nonetheless provide valuable guidance." Buettner v. R.W. Martin & Sons, Inc., 47 F.3d 116, 118 (4th Cir. 1995); see Parsons v. Jefferson-Pilot Corp., 333 N.C. 420, 425 (1993) ("[C]ommentary to a statutory provision can be helpful in some cases in discerning legislative intent.").

In this case, in accordance with the foregoing authorities, while plaintiff pleads a separate enumerated claim for breach of implied covenant of good faith and fair dealing, this is not a claim that can exist independently of a breach of contract claim, whether for breach of express warranty, or breach of other contractual terms and conditions under the UCC. Rather, it is properly construed as an alternative part of, or a component of, a claim for breach of contract. So construed and

17

limited, the claim may proceed forward and it is not subject to dismissal on the ground asserted by defendant in its motion.

Defendant cites to an unpublished North Carolina business court decision, Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp., No. 16 CVS 217, 2018 WL 3939848 (N.C. Super. Aug. 15, 2018), for the proposition that an independent claim for breach of implied covenant must be dismissed as a matter of law. There, the court held that "a breach of the implied covenant does not give rise to a separate cause of action under the UCC, but it may support an action for breach of contract." Id. at *6. In that case, however, the court addressed the viability of such a claim upon a summary judgment motion. Id. It is thus not helpful in determining pleading practice in this case under the Federal Rules of Civil Procedure, under which a "party may set out 2 or more statements of a claim or defense alternatively." Fed. R. Civ. P. 8(d)(2); see also Sara Lee Corp. v. Quality Mfg., 201 F. Supp. 2d 608, 615 (M.D.N.C. 2002) (analyzing claim of duty of good faith and fair dealing upon summary judgment motion, and holding claim failed as a matter of law where defendant "did what was expressly permitted in the Agreement"). In addition, the instant approach is not in conflict in substance with the reasoning of Kerry Bodenhamer Farms, where this court has construed plaintiff's breach of implied duty claim solely as an alternative part of, or component of, a claim for breach of contract.

In sum, the court allows plaintiff's breach of implied duty claim to proceed forward solely as an alternative part of, or component of, a claim for breach of contract. In this part, defendant's motion is denied.

## CONCLUSION

Based on the foregoing, defendant's motion (DE 19) is GRANTED IN PART and DENIED IN PART. Plaintiff's claims for fraud in the inducement (second claim), fraudulent

misrepresentation (third claim), and unfair and deceptive trade practices (sixth claim), are DISMISSED. Plaintiff's claim for breach of implied covenant of good faith and fair dealing (fifth claim), may proceed forward solely as an alternative part of, or component of, a claim for breach of contract. Plaintiff's claims for breach of express warranty (first claim) and right to reject and return (fourth claim), not addressed in defendant's motion, also may proceed forward. The court dispenses with argument hearing, as requested by plaintiff, because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

SO ORDERED, this the 22nd day of October, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge

19

Case 5:20-cv-00044-FL   Document 29   Filed 10/22/20   Page 19 of 19