IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-44-FL

LIRIS S.A.,                              )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )              ORDER
                                         )
MORRIS & ASSOCIATES, INC.,               )
                                         )
                    Defendant.           )


This matter is before the court on defendant's motion for summary judgment (DE 37).

Plaintiff responded in opposition and defendant replied. In this posture, the issues raised are ripe

for ruling. For the following reasons, the motion is denied.

## STATEMENT OF THE CASE

Plaintiff commenced this action on February 5, 2020, and filed the operative amended

complaint (the "complaint")[1] on June 22, 2020, asserting North Carolina common law and

statutory claims arising out of defendant's sale of poultry processing equipment to plaintiff.

Plaintiff asserts the following claims: 1) breach of express warranty, under N.C. Gen. Stat. § 25-

2-313; 2) right to reject and return, pursuant to the Uniform Commercial Code ("UCC") §§ 2-601

to 2-604; and 3) breach of implied covenant of good faith and fair dealing.[2]  Plaintiff seeks

---

[1]        Hereinafter, all references to the "complaint" in the text of this order and "Compl." in citations are to the
operative amended complaint filed June 22, 2020, unless otherwise specified.

[2]        In a prior order, entered October 22, 2020, the court dismissed additional claims for fraud in the inducement,
fraudulent misrepresentation, and unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1 ("UDTPA"), upon
defendant's motion to dismiss. See Liris S.A. v. Morris & Assocs., Inc., 496 F. Supp. 3d 931, 943 (E.D.N.C. 2020).

enforcement of terms and conditions of a contract for sale of goods, and plaintiff seeks damages with interest, costs, and attorney fees.

Following a period of discovery, defendant filed the instant motion, relying upon a statement of material facts and appendix thereto containing 1) excerpts of depositions of defendant's employees, Jose Ferney Garcia ("Garcia") and Jorge Reinoso ("Reinoso"), and plaintiff's employee, Santiago Saab ("Saab"); 2) an agreement between the parties, in Spanish and English translation, as described further herein, (hereinafter the "Agreement"); and 3) U.S. Patent No. 9,841,245 B1 (the "patent"). Plaintiff responded in opposition, relying upon additional excerpts of the same depositions, as well as an additional copy of the Agreement and a subsequent agreement between the parties. Defendant replied in support of its motion.

## STATEMENT OF UNDISPUTED FACTS

Plaintiff "is an Ecuadorean poultry producer." (Def's Stmt. (DE 39) ¶1).[3] Defendant "is a Garner-based manufacturer of systems for chilling poultry." (Id. ¶ 2). "In 2017, [plaintiff] entered into an agreement to purchase certain poultry equipment manufactured by" defendant. (Id. ¶ 3). "Specifically, [defendant] provided [plaintiff] with Quotation No. 4183 Srl, dated March 6, 2017, which, upon the acceptance of [plaintiff] as indicated by the signature of its general manager, [Saab], became the parties' Agreement. (Id. ¶ 4). "The original Agreement was written in Spanish." (Id. ¶ 5). "A certified English translation is found at Saab Dep. Ex. 2A and is referred to herein as the 'Agreement.'" (Id.; see Agreement 1 (Def's Ex. 5 (DE 40-5)).[4]

---

[3]  Pursuant to Local Rule 56.1(a)(2), the court cites to defendant's statements of undisputed facts where not "specifically controverted by a correspondingly numbered paragraph in [an] opposing statement."

[4]  Herein, all references and citations to the "Agreement," unless otherwise specified, are to the Agreement at DE 40-5. Page numbers specified in citations to the Agreement are to the page numbers designated on the face of the document (e.g., Page 1 of 13), and not to the page number of the exhibit when viewed through the court's case management/electronic case filing (CM/ECF) system (e.g., Page 2 of 14).

2

The text of the first page of the Agreement provides as follows:

Morris & Associates, Inc. is pleased to provide you with a quote for: One (1) Chilling System with Stainless Steel Auger Chillers, custom designed for your plant in Guayaquil — Ecuador. The system comprises the following:

## DESIGN CONDITIONS OF THE QUIK CHILL™ 4000

This Quik Chill™ 3000 is designed to chill a line of 6,000 dressed broilers per hour. The average outlet temperature will be between 3°C and 4°C after having reached the equilibrium. This performance is based on the following parameters:

➢ Average live bird weight of 6.75 lb or average eviscerated weight of 5.00 lb (74% performance).
➢ One hundred (100) birds per minute.
➢ The average temperature of dressed broilers will be between 3°C and 4°C with no 5.00 lb dressed broiler above 4°C.
➢ The make-up water will have a flow of 1.5 liters per bird and it will be delivered to the system at 27°C. It will be chilled by the Morris system to 0.5°C.
➢ The following increased performance guarantee is offered:
   ✓ We guarantee a fresh bird performance increase, measured at 48 hours, of 1.5%.
   ✓ A retention test will be performed at 48 hours under current operating conditions, and the same test will be performed after the equipment is installed, following the same procedure.
   ✓ The performance test consists of taking 3 samples from 15 birds, measuring the retention at 48 hours, being necessary to maintain a correct cold chain.
   ✓ It the parameter described in this section cannot be met, Morris will pay Liris a penalty of $167,600 USD. This penalty will be payable in proportion to the percentage of compliance. For example, if a 1% increase is achieved (66% of the guaranteed percentage), a penalty of 33% will be paid.
   ✓ A total residence of 100 minutes is necessary to reach the temperature; 30 minutes in the DTM Chiller and 70 minutes in the existing chillers.
   ✓ In case of any inconformity with the retention, Liris shall inform Morris within 30 days of the installation, at the latest. Morris will have 15 days to go to the plant and 120 days after the notification to make the necessary adjustments in the operation in order to offer a definitive solution.

(Agreement 1). There is also a comment in the margin of the translation stating that the reference to "3000" is a "possible typo." (Id.).

3

The Agreement contains a section titled "PLANT CONDITIONS' which states:

> While bird temperature, water temperature, and moisture pick-up are controlled and can be modified within the chilling system, there are other factors outside of the area of the chillers that may also have an effect on plant performance, such as adequate refrigerant supply at times of high demand, plucking methodology, scalding temperature, chiller water level during operation, live bird condition, variable ambient conditions, among others. Optimal performance of a chilling system depends on the proper functioning of these aspects of the operation. Additionally, proper maintenance and monitoring of these primary and secondary processes and conditions will ultimately yield the greatest service life of the chiller with the lowest required maintenance.

(Agreement 12).

"Finally, the Agreement contains certain standard Morris Terms and Conditions of Sale, including an integration clause, and a North Carolina choice of law and forum provision."  (Def's Stmt. (DE 39) ¶11) (quoting Agreement 13, at § XII). "Those terms and conditions also include a statement regarding the explicit warranty provided ('free from defects in material and workmanship,' and specifically disclaiming 'all other warranties whether statutory, express or implied, including implied warranties for use and merchantability except as to title.' (Id.) (quoting Agreement 13, at § VI).

"The equipment was ultimately installed at Liris on or around May of 2018."  (Id. ¶12). "Thereafter, Liris contends, the equipment was unable to meet the 1.5% increase in yield provision contained in an express warranty in the parties' Agreement, . . . and Liris further contends that it is entitled to the monetary penalty outlined in the Agreement."  (Id.). "Liris, . . . never operated the equipment under the conditions outlined in the Agreement, particularly under the required 6,000 dressed broilers per hour for which the equipment was designed."  (Id. ¶ 13).

Additional facts regarding the conditions of plaintiff's plant around the time of installation of the equipment and thereafter, viewed in the light most favorable to plaintiff, may be summarized as follows.  According to testimony of Reinoso, prior to installation of the equipment, "the speed

[plaintiff was] running" was 3,200 birds per hour. (Reinoso Dep. 74). According to testimony of Garcia, "when we first went for startup, [Saab] said we were going to start running at 4,000 with the goal of getting to 6,000." (Garcia Dep. 94). "But, in reality they were running at . . . 3,120 per hour." (Id.). According to testimony of Saab, defendant's employees "knew that our plant ran at 3,000 birds per hour and that we wanted to increase it up to 6,000." (Saab Dep. 25).

According to testimony of Reinoso, the parties conducted a "retention test . . . prior to the installation of the equipment," and they performed "startup tests when they installed the equipment." (Reinoso Dep. 110, 135). "[T]he line speed wasn't there," and "there were other issues with the . . . scalding and with the picking in the plant along with other equipment that is part of the . . . chicken processing." (Id. 136). Defendant "tried to play with water temperature . . . air agitation . . . water levels of the equipment . . . different scalding temperatures . . . [and] different line speed." (Id. 162).

According to testimony of Saab, "[d]uring . . . 120 days that we were performing tests, we received several quality complaints because the water that was supposed to be absorbing . . . in an intramuscular fashion by the chicken was not retained." (Saab Dep. 39). "And during transport to our client, that water was drained out of the chickens." (Id.).

Ultimately, according to testimony of Reinoso, defendant's employees told plaintiff that it "need[ed] to buy the proper equipment for the line speed," but plaintiff "didn't buy it." (Reinoso Dep. 164). Thereafter, defendant "didn't try any further." (Id.). Plaintiff "paid [its] entire bill on" the equipment installed. (Id. 146).

Further contentions and facts, pertinent to the analysis of plaintiff's claims, will be discussed in the analysis herein.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

1.     Breach of Warranty

Plaintiff claims that defendant breached a warranty in the Agreement by refusing to pay the fine provided in the "retention rate guarantee provisions" of the Agreement calling for a "1.5% increase in yield." (Compl. ¶¶ 76, 80). Defendant argues that there is no genuine issue of fact, based on the premise that the Agreement unambiguously conditions the asserted guarantee on running "6,000 birds per hour," where it is undisputed that plaintiff never ran 6,000 chickens per hour. (Def's Mem. (DE 38) at 15). For the reasons set forth below, the court disagrees with the premise of defendant's argument and determines that genuine issues of fact preclude summary judgment.

Under North Carolina law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." N.C. Gen. Stat. § 25-2-213. "A warranty, express or implied, is contractual in nature." Wyatt v. N. Carolina Equip. Co., 253

7

N.C. 355, 358 (1960). "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276 (2019).[5] Accordingly, to establish a breach of express warranty, a buyer of goods must establish 1) an affirmation of fact or promise made by the seller relating to the goods, 2) which becomes part of the basis of the bargain, and 3) which was breached by the seller. See N.C. Gen. Stat. § 25-2-213(1)(a).

In addition, "[a] failure by the purchaser to comply with the conditions of the warranty is fatal to a recovery for breach of the warranty in an action thereon." Lilley v. Manning Motor Co., 262 N.C. 468, 471 (1964). "[W]here a party sets up and relies upon a written warranty he is bound by its terms and must comply with them." Hyman v. Broughton, 197 N.C. 1, 1 (1929).

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 363 N.C. 623, 631 (2009). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94 (1949). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976).

"When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury." Farmers Bank v. Michael T. Brown Distribs., Inc.,

---

[5]    In all citations in this order, internal quotation marks and citations are omitted, unless otherwise specified.

307 N.C. 342, 347-48 (1983). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 525 (2012); see Register v. White, 358 N.C. 691, 695 (2004). "Thus, if there is uncertainty as to what the agreement is between the parties, a contract is ambiguous." Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C., 362 N.C. 269, 273 (2008).

"[A] contract is to be construed as a whole with each provision considered in the context of the entire contract." Lattimore v. Fisher's Food Shoppe, Inc., 313 N.C. 467, 473 (1985). "All instruments should receive a sensible and reasonable construction, and not such a one as will lead to absurd consequences or unjust results." De Bruhl v. State Highway & Pub. Works Comm'n, 245 N.C. 139, 145 (1956). In construing a contract, "note must be taken of the purpose to be accomplished, the situation of the parties when they made, and the subject-matter of the contract." Id. "[A]ny ambiguity in a written contract is to be construed against the party who prepared the instrument." Morrell v. Hardin Creek, Inc., 371 N.C. 672, 691 (2018).

In this case, the express warranty upon which plaintiff relies states, in pertinent part: "We guarantee a fresh bird performance increase, measured at 48 hours, of 1.5% . . . . If the parameter described in this section cannot be met, [defendant] will pay [plaintiff] a penalty of $167,600 USD." (Agreement 1) (in this part, hereinafter, the "express warranty"). It is undisputed that plaintiff did not receive a 1.5% performance increase, and that defendant did not pay a penalty to plaintiff. (Def's Stmt. (DE 39) ¶12; Reinoso Dep. 135, 146, 162, 164; Saab Dep. 39). Instead, the critical issues in dispute are what conditions the Agreement required to trigger the express warranty, and whether those conditions were satisfied. With respect to the conditions required, the Agreement is ambiguous in multiple respects.

9

The court begins, as it must, with the plain language of the Agreement. In this respect, the Agreement does not state at any point specifically what conditions are required to trigger the express warranty. It suggests, rather a range of potential conditions, from narrow to broad, depending on multiple reasonable alternative interpretations of the language and structure of the Agreement. At the narrowest level, the Agreement suggests that the express warranty is triggered, simply, when "<u>the parameter</u> described in <u>this section</u> cannot be met." (Agreement 1) (emphasis added). In turn, it is open to reasonable interpretation what singular "parameter" is being referenced, where there are no explicit "section[s]" of the Agreement. There are, instead, headings (e.g., "DESIGN CONDITIONS OF THE QUIK CHILL ™ 4000" "TERMS AND CONDITIONS" "PLANT CONDITIONS"), an introductory paragraph, arrow bullet points at one level of indent, and check mark bullet points at another level of indent. (<u>Id.</u> at 1, 12). There is also a plural reference to "parameters" at the end of the introductory paragraph. (<u>Id.</u>).

Further compounding ambiguity of the conditions for express warranty is the reference in the first heading to "<u>DESIGN</u> CONDITIONS," which, notably, does <u>not</u> state "<u>warranty</u> conditions." (<u>Id.</u>) (emphasis added). The structure and contents under the heading "DESIGN CONDITIONS OF THE QUIK CHILL ™ 4000" raise further questions of reasonably divergent interpretations. (Agreement 1). To begin, it states: "This Quick Chill ™ [4000] is <u>designed to</u> chill a line of 6,000 dressed broilers per hour." (<u>Id.</u>) (emphasis added). Then, it states"[t]he average outlet temperature will be between 3C and 4C after having reached the equilibrium," after which it states "<u>This performance</u> is based on the following parameters. . . ." (<u>Id.</u>) (emphasis added). By its plain terms and context, this third sentence of the introductory paragraph reasonably can be interpreted to refer back specifically to the performance of between 3°C and 4°C, and not 6,000 birds per hour. Further, this third sentence does not itself state a guarantee, nor does it in

Case 5:20-cv-00044-FL   Document 49   Filed 03/25/22   Page 10 of 21

itself state these features, including 6,000 dressed broilers per hour, are the conditions of any guarantee. Rather, it suggests that the "parameters" that follow are for achieving an outlet temperature between 3°C and 4°C.

Next, there are two levels of bullets at two levels of indents. From the outset, this structure suggests that the first four arrow bullets are the "parameters" that determine the designed performance of outlet temperature between 3°C and 4°C at a rate of 6,000 dressed broilers per hour. (Id.). It also suggests that the fifth arrow bullet point, followed by check bullet points, comprises a separate section dedicated to describing the express warranty. The structure and contents of the check bullet points suggest that they outline the singular or plural condition(s) for triggering the express warranty.

The second check bullet point suggests, more particularly, that a key determinant for triggering the express warranty is the "retention test" performed at two points: 1) "A retention test will be performed at 48 hours under current operating conditions," and 2) "the same test will be performed after the equipment is installed, following the same procedure." (Id.) (emphasis added). This description of the "retention test" interjects yet further ambiguities into the conditions for triggering the warranty. (Id.). In particular, it suggests that the first test will be "under current operating conditions," and it reasonably can be interpreted to suggest that the second test will take place "after the equipment is installed," without any change to the "current operating conditions," except for the installation of the equipment. (Id.). This interpretation is bolstered by the repetition of the word "same" in the phrases "same test" and "same procedure." (Id.).

Additional ambiguity arises due to the part of the Agreement with the heading "PLANT CONDITIONS," which suggests several conditions impact "[o]ptimal performance of a chilling system," but notably omitted is any reference to 6000 birds per hour. (Agreement 12). Rather, it

states: "there are other factors outside of the area of the chillers that may also have an effect on plant performance, such as adequate refrigerant supply at times of high demand, plucking methodology, scalding temperature, chiller water level during operation, live bird condition, variable ambient conditions, among others." (Id.).

Independent of the foregoing, a further ambiguity in the trigger for the express warranty is the provision in the Agreement for notification by plaintiff and further action by defendant. In particular, the Agreement states: "In case of any inconformity with the retention," plaintiff shall "inform [defendant] within 30 days of the installation." (Id.). Defendant "will have 15 days to go to the plant and 120 days after the notification to make the necessary adjustments in the operation in order to offer a definitive solution." (Id.). This provision contains multiple points of open ended language, each bearing on a reasonable interpretation of what is required to trigger the express warranty.

For example, this provision, places the onus first on plaintiff to "inform" defendant of "any inconformity with the retention," but from that point onward, it is incumbent upon defendant "to go to the plant" and "make the necessary adjustments in the operation." (Id.). In this respect, it is ambiguous whether defendant can, should, or must, direct changes to the operation of the equipment, or to the operation of the plant, or both. One reasonable interpretation is that defendant would have full ability to direct changes to the operation of the equipment, but may or may not dictate changes to the operation of the plant, in light of the procedures for conducting the retention test. (Id.). This ambiguity is compounded by the final phrase of this provision, stating "in order to offer a definitive solution." (Id.) (emphasis added). The phrase "to offer," by its plain meaning, is not equivalent to "to dictate" or "to require," but rather to provide plaintiff with a proposed solution. In this respect, the provision is ambiguous as to which party will have final say as to

whether the "adjustments in the operation" are necessary to overcome the "inconformity with the retention." (Id.).

In noting the foregoing ambiguities, the court does not foreclose defendant's proposed interpretation of the Agreement, but rather provides the foregoing discussion as an illustration of the points at which the parties reasonably diverge in their proposed interpretations of the Agreement. For instance, it is possible to interpret the Agreement to require 6000 birds per hour to trigger the express warranty, but this is not the only interpretation possible. It is also equally possible to interpret the Agreement to require a failed retention test after installation of the equipment under "current operating conditions," and a further failed test after the 120 day cure period. (Id.). Under this interpretation, 6000 birds per hour is not a requirement of the warranty, but rather a designed feature, or capability, of the equipment.

Where the Agreement is susceptible to more than one reasonable interpretation, other tools of construction further demonstrate a genuine issue of fact. Most pertinent here are the rules that "note must be taken of the purpose to be accomplished, the situation of the parties when they made, and the subject-matter of the contract," De Bruhl, 245 N.C. at 145, and that "any ambiguity in a written contract is to be construed against the party who prepared the instrument." Morrell, 371 N.C. at 691. Here, drawing inferences from the facts in the light most favorable to plaintiff, when defendant drafted and prepared the Agreement for presentation to plaintiff, the parties "knew that [plaintiff's] plant ran at 3,000 birds per hour and that we wanted to increase it up to 6,000." (Saab Dep. 25). However, under this viewpoint, it was not in contemplation of the parties at the time the agreement was executed that plaintiff would be required to run exactly 6,000 birds per hour, or even substantially close to that amount, in order to satisfy the conditions for the warranty. Further, drawing inferences in this manner, the requisite retention tests failed, after defendant was provided

fully an opportunity to make adjustments to both the equipment and plant conditions, sufficient to trigger the warranty penalty that defendant has not paid. (Reinoso Dep. 162). Accordingly, genuine issues of fact remain for trial as to plaintiff's first claim.

Arguments advanced by defendant to the contrary are insufficient to grant summary judgment in its favor. For example, defendant cites to four cases outside of North Carolina for the proposition that the burden is on plaintiff to demonstrate compliance with "directions for the use of the product" or "instructions found to be conditions precedent to the activation and enforcement of the warranty." (Def's Mem. (DE 38) at 15-16 (quoting Overstreet v. Norden Lab'ys, Inc., 669 F.2d 1286, 1290 (6th Cir. 1982), and Elanco Prod. Co. v. Akin-Tunnell, 516 S.W.2d 726, 731 (Tex. Civ. App. 1974); and citing Lane v. Corbitt Cypress Co., 215 Ga. App. 388, 389 (1994), and Melcher v. Boesch Motor Co., 188 Neb. 522, 525–26 (1972)).

The foregoing cases and statements of law do not establish a basis for summary judgment in this case for two reasons. As an initial matter, the rule of law that plaintiff must demonstrate compliance with "directions" or "instructions" begs the question in this case what those directions or instructions were, particularly for triggering the warranty. As set forth above, the Agreement is ambiguous as to what directions or instructions trigger the warranty in this case. Drawing inferences from the facts in plaintiff's favor, plaintiff has established a genuine issue of fact that it met directions and instructions for using the equipment and triggering the warranty.

Second, the cases cited by defendant are instructively distinguishable and indeed compel the result reached here. Overstreet concerned the proper jury instructions following a trial by jury arising out of use of a vaccine for viruses in horses. See 669 F.2d at 1288-1289. Elanco also followed a jury trial where the jury expressly "found that both of the instructions had been violated," which were "found to be conditions precedent to the activation and enforcement of [a]

14

warranty" for a herbicide. 516 S.W.2d at 731. Neither of these cases involved interpretation of a warranty at summary judgment, nor did the warranties in those cases require direct participation in adjustment of equipment by the defendant after installation, as here. Accordingly, they are not helpful at this juncture.

Similarly, Melcher followed a jury trial where it was "a question of fact for the jury as to whether the plaintiff complied with the service requirements" for his vehicle warranty. 188 Neb. at 525. Finally, in Lane, it was "undisputed that defendant provided written installation instructions which specifically prohibited the use of felt between shingle courses," but that is what the plaintiff used, requiring summary judgment for defendant. 215 Ga. App. at 389. There is no such undisputed violation of written installation instructions here with "specific prohibitions." Id. Indeed, for the instant case to be comparable to Lane, among other differences, the Agreement would have needed to expressly state that use of the equipment without attaining a line speed of 6,000 birds per hour is prohibited. The Agreement contains no such prohibition.

Defendant argues that plaintiff fails to offer a reasonable construction of the warranty that supports its position. The court disagrees. Plaintiff, in fact, advances several constructions of the warranty that are reasonable, even though none of these constructions, like defendant's, are compelled by the ambiguous language of the Agreement. For example, plaintiff contends that "the Agreement establishes that the Defendant's prechiller system is described in the Agreement as being designed to cool a line of 6,000 processed chickens per hour and the average temperature at the end of the cooling will be 3 to 4 degrees celsius, and that the parameters required to achieve this are the first four arrows below the initial paragraph under 'Design Conditions of the Quick Chill 4000 System.'" (Pl's Mem. at 16). This construction is consistent with one possible

15

construction of the Agreement outlined by the court herein, for which the "design conditions" of the equipment are not the requirements for triggering the warranty. (Agreement 1).

Relatedly, plaintiff then proposes a construction of the "retention test" triggering the warranty as follows: "according to the contract language, Defendant's DTM equipment should have been installed, and following the same procedure, a second test should have been carried out after the chickens had been sitting for 48 hours," such that "the only variable that should have changed was indeed the equipment, the conditions according to the Agreement, as it is written, would be the conditions prior to installation of the equipment." (Pl's Mem. at 18). This, again is consistent with one possible construction of the Agreement per the court's analysis herein, where the Agreement does not link unambiguously the retention test with the "designed" features of the equipment, and where the Agreement calls for the "same test" "following the same procedure" "after the equipment is installed." (Agreement 1).

As further support for this construction, plaintiff also points to interpretation of the sixth check bullet, such that "Defendant will be directly involved and/or responsible in the event that parameters are not met," and that the provision "places a cure period requirement" on defendant. (Pl's Mem. 21, 23). Both of these constructions reasonably recognize the substantial procedures set up in the Agreement for defendant to "go to the plant and . . . make the necessary adjustments in the operation in order to offer a definitive solution." (Agreement 1).

Defendant criticizes plaintiff's suggestion that "6,000 dressed broilers per hour" should be interpreted to mean "up to" that amount. Defendant argues that such a construction impermissibly adds terms that are not in the Agreement. However, in light of the ambiguities in the structure and text of the Agreement, this construction is no more implausible than interpreting the Agreement to require "exactly," "substantially," or even "at least," 6,000 birds per hour, all of which are

16

reasonable alternative interpretations of the Agreement. Moreover, plaintiff's proposed construction is consistent with "the purpose to be accomplished [and] the situation of the parties when they made" the Agreement, De Bruhl, 245 N.C. at 145, where defendant knew the parties "were going to start running at 4,000 with the goal of getting to 6,000," (Garcia Dep. 94) (emphasis added), and that plaintiff "wanted to increase it up to 6,000." (Saab Dep. 25) (emphasis added).

Defendant contends that the patent for the equipment demonstrates that it must run at 6,000 chickens per hour to operate correctly. (Def's Mem. (DE 38) at 9-10 n. 5). This contention is unavailing on several levels. First, there is no evidence in the present record that defendant communicated this to plaintiff upon execution of the Agreement. Rather, the testimony as emphasized above reflects that the parties understood that the equipment could operate correctly at less than 6,000 birds per minute. Second, while the Agreement references the "patented design of the Rocker paddle," it does not state anything about the number of birds per minute that must be inputted into the equipment to operate. (Agreement 4). Indeed it suggests to the contrary, where it provides "a cushion of 20 minutes per shift" for the entry of broilers into the equipment, as well as "a dedicated speed variator." (Id. at 4-5). Third, the portions of the patent cited by defendant do not include any reference to a requirement of 6,000 birds per minute. (See, e.g., DE 40-6 at 18 (Patent No. 9,841,245 B1 at col. 6, lines 51-58)).

Finally, defendant characterizes one proposed alternative construction by plaintiff as "so absurd as to call into question its seriousness with respect to this entire enterprise." (Def's Mem. (DE 48) at 8. For its part, plaintiff contends this alternative construction could entitle it to summary judgment in its favor, which it requests in its brief. (Pl's Mem. (DE 45) at 22). Under this alternative construction, "irrespective of what parameter has not been met, and irrespective of

17

whose fault it is that the parameter has not been met, if it cannot be met, Defendant will pay Plaintiff the Guarantee penalty or fine." (Id.).

To the extent plaintiff suggests that the penalty provision should be read independent of the remainder of the Agreement, the court agrees this alternative construction would lead to absurd results. Accordingly, plaintiff's request for summary judgment in its favor is unfounded. However, rejecting that extreme construction also does not entitle defendant to summary judgment in its favor. Among other points, it is reasonable to infer that the Agreement requires compliance by plaintiff with directions and instructions for use of the equipment, while at the same time the scope of those directions and instructions is open to reasonable alternative constructions. The Agreement also provides defendant with the opportunity to "make the necessary adjustments" and to "offer a definitive solution," (Agreement 1), while at the same time the extent to which defendant can insist upon adjustments to the equipment and the plant is also open to reasonable alternative constructions.

In sum, genuine issues of fact preclude summary judgment in favor of defendant on plaintiff's breach of warranty claim. Therefore, defendant's motion is denied in this part.

2.      Right to Reject and Return

Plaintiff asserts a claim for a right to reject and return defendant's equipment, on the basis that the "equipment was nonconforming with the Agreement" and a reasonable amount of time "after the cure period" has passed. (Compl. ¶ 115-116). In seeking summary judgment on this claim, defendant argues that the instant claim fails "for the same reasons" as plaintiff's breach of warranty claim. (Def's Mem. (DE 38) 17). Thus, where the court determines that a genuine issue of fact remains on plaintiff's breach of warranty claim, defendant's motion for summary judgment on the instant claim must be denied.

18

The court writes separately to address an alternative basis for recovery under this claim, asserted by plaintiff in response to defendant's motion. In particular, plaintiff asserts that it has a right to reject and return under N.C. Gen. Stat. § 25-2-601(a), on the alternative basis that "not only was [defendant's] equipment unable to yield the increased guaranteed retention rate, but [also] . . . the installation of [defendant's] equipment caused the water retention rate to fall below historical averages," and is thus "defective and eligible for rejection and return." (Pl's Mem. (DE 45) at 25).

Defendant argues that plaintiff cites no evidence in the record in support of this alternative basis for recovery. However, while it is true that plaintiff references only its complaint in the text of its argument, plaintiff relies upon pertinent testimony in opposition to summary judgment. Specifically, Saab testified: "[d]uring . . . 120 days that we were performing tests, we received several quality complaints because the water that was supposed to be absorbing . . . in an intramuscular fashion by the chicken was not retained." (Saab Dep. 39). "And during transport to our client, that water was drained out of the chickens. . . [a]nd that water was shocking, it was evident and it was shocking." (Id.). While there is minimal testimony in the record, and neither party included the complete deposition of Saab, this testimony, viewed in the light most favorable to plaintiff, supports plaintiff's alternative basis for recovery.

Therefore, that part of defendant's motion pertaining to plaintiff's claim for right of rejection and return is denied.

3.    Breach of Implied Duty of Good Faith and Fair Dealing

In the alternative to its breach of warranty claim, plaintiff contends that defendant breached a duty of good faith and fair dealing by failing to "inform Plaintiff of the specific requirements for the equipment to conform or perform properly," particularly that the equipment "must operate at

exactly 6,000 chickens in order to be able to conform successfully to the retention promises made by the Defendant." (Compl. ¶ 124). Defendant argues that this claim fails because plaintiff "can only show that the equipment sold by [defendant] did not meet the guarantee when operated <u>outside</u> the 'parameters' expressly set forth in the Agreement." (Def's Mem. (DE 38) at 18).

The court previously set forth the standards for a breach of duty of good faith and fair dealing in its October 22, 2020, order:

> The duty encompasses an implied promise not to do anything to the prejudice of the other inconsistent with their contractual relations. . . . An implied duty of good faith in a contract is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise. An implied duty is simply a recognition of conditions inherent in expressed promises. Accordingly, a claim for breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract.
>
> [N.C. Gen. Stat. § 25-1-304] does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.

<u>Liris S.A.</u>, 496 F. Supp. 3d at 942 (internal citations and quotations omitted).

Here, where defendant's argument is premised upon its asserted interpretation of the Agreement, and where the court has determined that a genuine issue of fact remains as to interpretation of the Agreement, summary judgment on plaintiff's alternative claim for breach of good faith and fair duty is not warranted. If, as plaintiff contends, the Agreement reasonably is construed to require a penalty, not conditioned upon running the equipment at 6,000 birds per hour, then plaintiff may be able to establish an alternative claim for breach of good faith and fair duty, which is "part and parcel of [its] claim for breach of contract." <u>Id.</u> Principles of good faith and fair duty may be particularly pertinent under the circumstances of the instant case, where the Agreement includes open-ended provisions regarding the parties' responsibilities during the cure period. (<u>See</u> Agreement 1).

20

In sum, that part of defendant's motion seeking summary judgment on plaintiff's claim for breach of duty of good faith and fair dealing is denied.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 37) is DENIED. In accordance with case management order entered July 15, 2020, as amended January 13, 2021, and June 2, 2021, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within 14 days from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. In addition, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 25th day of March, 2022.

LOUISE W. FLANAGAN
United States District Judge